UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          vs.<br><br>ANGELA MARIE JOHNSON,<br><br>                    Defendant. | 4:15-CR-40056-KES<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Angela Marie Johnson is before the court on an indictment charging her with interstate travel in aid of a racketeering enterprise, in violation of 18 U.S.C. § 1952(a)(1).  See Docket No. 1.  She is accused of traveling in interstate commerce to distribute the proceeds of the sale of marijuana.  Id.  She now moves to suppress the fruits of the search of her motor vehicle on January 15, 2015.  See Docket No. 35.  She also moves to regulate discovery.  See Docket No. 36.  The government resists both motions.  See Docket No. 41.  This matter was referred to this magistrate judge for the holding of an evidentiary hearing and the making of a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## FACTS

Evidentiary hearings in this matter were held on February 4, 2016, and March 10, 2016.[1]  The government was present through its Assistant United States Attorney, Jennifer Mammenga.  Ms. Johnson waived her personal appearance and was not present at either hearing, but her attorney, Assistant Federal Public Defender Timothy Langley, was present on her behalf.  Two witnesses testified and numerous exhibits were received at the hearings.  From this evidence the court makes the following findings of fact.

Ms. Johnson's indictment in this case arises out of a traffic stop conducted by Trooper Brian Biehl of the South Dakota Highway Patrol on January 15, 2015.  The result of that traffic stop was a search in which approximately $99,000 in cash was discovered in the rear of Ms. Johnson's vehicle.

Trooper Biehl has worked for the South Dakota Highway Patrol for 15 years.  In July 2011, he and his dog, Zara, went through initial training in order to certify Zara as a drug detection dog.  Zara is a Malinois breed of dog.  She and Trooper Biehl were certified as a drug dog detection team in August, 2011.  Since that time, Zara and Trooper Biehl have undergone annual recertification, always successfully.  In addition, they train two full days per

---

[1] A great deal of documentary discovery was delivered to defendant on the eve of the first hearing.  The evidentiary hearing was continued and reconvened after defendant had had a chance to go through the documents.

month with other troopers who are police service dog handlers.[2]  Trooper Biehl also tries to train Zara on additional days as their schedule allows.  Trooper Biehl has only ever worked with one drug detection dog, Zara, and Zara has never worked with any handler other than Trooper Biehl.  Zara's most recent recertification before the traffic stop at issue in this case took place in October, 2014.

Zara displays two behaviors relative to detecting the odor of drugs:  the "alert" and the "indication."  An "alert" is an unlearned, untrained, natural behavior that a dog shows when it is onto something interesting.  It can be open and obvious, like wagging a tail or yipping, or, in Zara's case, more subtle like a glance of the head (described by Trooper Biehl as a "head check") and/or increased breathing rate.  When screening dogs to determine whether they will make good drug detection dogs, an important factor is the "alert" behavior the dog displays.  More obvious alert behavior is preferred.

The "indication," as distinguished from the "alert," is a trained behavior. In Zara's case, she is trained to "indicate" by sitting and staring at the place to which she is indicating.  Trooper Biehl testified that Zara is high strung and does not sit for long when she indicates—it is just a brief movement.  The "indication" is the dog's communication to the handler that it has found the odor of the item it is looking for and is showing the handler the strongest

_____

[2] Lieutenant Sheldon testified the ongoing training requirement was four hours per week.  This would be the same as two full days per month if one assumes a month has four weeks.  Thus, both Sheldon and Biehl testified to the same quantity of ongoing training, they just stated it differently.

source of the scent of that item.  An "indication" is not valid unless it is preceded by an "alert."

When beginning a sniff, Trooper Biehl will give Zara the command "geef." He explained that "geef" signals to Zara they are working now, that she should begin sniffing and looking for drugs.

Zara is trained to alert to the odor of a variety of illicit drugs:  marijuana, mushrooms, methamphetamine, ecstasy, and cocaine.  Since she is trained to alert to the *odor* of drugs, an indication by her does not necessarily mean drugs themselves are present, as Trooper Biehl emphasized several times.  The odor of drugs can transfer to other objects.  This may trigger an indication even after the drugs have been removed.  For example, Trooper Biehl testified that someone might handle drugs and then touch an object, transferring the odor to the object.

Lieutenant Scott Sheldon, in charge of training police service dogs and their handlers for the South Dakota Highway Patrol, testified that a certain percentage of cash in general circulation in the United States is tainted with drug odors.  Lieutenant Sheldon said the presence of currency tainted with drug odors was a "common occurrence," so much so that, in training, he takes care to use shredded, *uncirculated* cash as a kind of double-blind to make sure a dog in training is not alerting to tainted cash.  Lieutenant Sheldon testified that a drug dog can alert to cash in general circulation that is tainted with drug odor.  Trooper Biehl testified it was his understanding that general circulation

currency which is tainted contains drug odor at too minute a level for a drug dog to detect.

Trooper Biehl travels with Zara in his patrol car at all times when he is patrolling.  Trooper Biehl does not deploy Zara at every traffic stop; only those where he believes he has reason to think drugs may be found.  Early on in their association, Trooper Biehl deployed Zara at more traffic stops than he does now.  He testified that is because he has become more experienced and knowledgeable about when drugs likely may be present.  Because he has become better at judging situations, Zara's rate of indicating at traffic stops has gone up.  Trooper Biehl stated previously that Zara indicated approximately 50% of the time when she was deployed.  The records introduced into evidence at the hearings in this matter establish she indicates approximately 59% of the time when she is deployed.

Trooper Biehl testified that "numerous times" after Zara has indicated to the presence of the odor of illegal narcotics, no narcotics are found in the subsequent search.  Trooper Biehl testified that Zara's indication is no particular guarantee that drugs are present.  Lieutenant Sheldon testified similarly:  that an alert and an indication by a properly trained drug dog mean that drug *odor* is present, but not necessarily drugs.

Ms. Johnson's counsel introduced into evidence 68 exhibits, Defendant's Exhibits 1-68, showing Zara's performance in the field and in training.  Some of these performance records are for field deployment of Zara, but some of the performance records are for training under controlled circumstances where

5

Trooper Biehl knows a particular drug is present and knows where the drug is located.

These records indicate that out of 410 deployments of Zara, she gave an indication to the presence of drugs 241 times.  Of these 241 occasions when Zara indicted, there were 78 times where no drugs were found.  Thus, conversely, on 241 occasions when Zara indicted, drugs were found 163 times. On 60 of these 163 occasions when drugs were found, the drugs present were in such small quantities that they could not be measured or weighed.[3]  From these statistics, one can conclude that 68% of the time when Zara indicated to the presence of drugs, some drugs in some quantity were found.  Thirty-two percent of the time when she indicated, no drugs were found.  The incident in this case is recorded in these records of Zara's performance.  See Defendant's Exhibit No. 62.  Her performance in this case is classified as one of the times she indicated and no drugs were found.  Id.

Trooper Biehl testified that a drug search by Zara is a joint endeavor between he and the dog with Trooper Biehl being an active participant.  There are several ways Trooper Biehl participates in the search with Zara.  For example, Trooper Biehl uses the same or very similar language every time when telling a driver that he is going to let Zara sniff his or her vehicle.  Zara recognizes this language means she is going to get out of the patrol car and begins to get excited, whining and becoming more agitated.

---

[3] This is indicated on Defendant's Exhibits 1-68 by the words "trace," "residue" or "ua," which means "unknown amount," an amount too small to weigh or measure.

When Trooper Biehl wants Zara to sniff a vehicle, he tells her "geef." When Trooper Biehl believes he has seen Zara alert to a particular location on a vehicle, he brings her back to the same location, showing her his hand where he wants her to concentrate her sniff.  In training exercises, Trooper Biehl describes this as "following the magic hand."  See Defendant's Exhibit 28, p. 2. It is behavior he has trained Zara to do.  Trooper Biehl calls bringing Zara back to an area he wants her to concentrate on as "reinforce[ing]" her indication. See Defendant's Exhibit 5, p. 2.

When Zara indicates, she gets positive feedback from Trooper Biehl by him saying "good geef" or "good girl" and pretending to throw her toy for her.[4] This occurs both in controlled situations such as training where Trooper Biehl knows narcotics are present and that Zara has successfully found them, but also in the field in situations—like this case—before Trooper Biehl has conducted the search and, therefore, before he knows if narcotics will be present.  Trooper Biehl testified, however, that saying the word "geef" does not cause Zara to indicate.

Trooper Biehl testified that there is no negative feedback given to Zara if she indicates and he does not find drugs.  This is in large part because odor is invisible, Zara indicates to odor not drugs, so Trooper Biehl has no way of knowing if a particular indication by Zara was faulty or not.  The fact that no drugs are subsequently found does not necessarily mean there was no *odor* of

---

[4] Trooper Biehl used the word "cheat" to describe this positive reinforcement, as in "cheating" Zara off the vehicle by making her think he is throwing her toy.

drugs.  He testified it would be unfair to punish Zara for an indication that he has no way of knowing was wrong or right.

On January 15, 2015, Trooper Biehl was in Brule County on Interstate 90 near mile marker 287 when he observed Ms. Johnson driving west at a rate three miles above the posted speed limit.  The trooper pulled Ms. Johnson over by activating his lights and siren.  When both vehicles were stopped on the shoulder of the highway, Trooper Biehl approached Ms. Johnson's vehicle on the passenger side.  Ms. Johnson was the only occupant of the vehicle.

Trooper Biehl, testifying more than a year after the event at the evidentiary hearing in this matter, testified that he did not review the video before the hearing.  He agreed that the video, if it does not coincide with his testimony, is the more accurate record of what occurred.  A review of Exhibit B, the video of this traffic stop, reveals the following.

Ms. Johnson pulled her car off the road and onto the shoulder of the highway, stopping at 15:05:15.  Trooper Biehl made contact with her at 15:05:33 when he greeted her and asked for her license and registration.  He asked Ms. Johnson where she lived, and she replied "Oceanside."  Trooper Biehl was holding her California driver's license at this point, so there was no need for Ms. Johnson to specify that her home was in Oceanside, *California*. See Exhibit A, Docket No. 40-1. Trooper Biehl announced that he was going to give her a courtesy ticket for speeding and asked her to have a seat in his patrol vehicle.  When Ms. Johnson demurred, Trooper Biehl responded "That's

how we do it here.  Just come on back to the car with me for a minute."  This
occurred at 15:06:22.

Ms. Johnson was dressed in a large parka, a stocking cap, and had a
scarf wrapped around her neck several times, covering her entire neck all the
way up to her chin and jawline.  Not one centimeter of Ms. Johnson's neck is
exposed in the image one sees of her in the video of the traffic stop.  See
Exhibit C, Docket No. 40-3; see also Exhibit B, Docket No. 40-2 at 15:06:31.[5]
Trooper Biehl never testified that Ms. Johnson disrobed at any point, exposing
her neck.  Zara was in the rear compartment of Trooper Biehl's patrol car while
Trooper Biehl spoke to Ms. Johnson.

Once inside the patrol car, Trooper Biehl asked how Ms. Johnson was
doing.  She said she was on her way to a funeral.  Trooper Biehl asked where.
Ms. Johnson said "Oceanside."  Trooper Biehl asked where she was coming
from.  She replied "a friend's house."  Trooper Biehl asked, "In South Dakota?"
Ms. Johnson said "No."  Trooper Biehl persisted:  where at?  Ms. Johnson did
not answer right away.  Trooper Biehl again asked where she was coming from.
Ms. Johnson answered, "Cape Cod."[6]  Trooper Biehl finally asked whose

---

[5] The reader is directed to look at the original Exhibit C on file in the clerk's
office rather than the scanned version of that exhibit available electronically on
the court's docket.  The original of Exhibit C is lighter and one can see more
detail than the scanned exhibit in the court's docket, which scanned in darker
than the original, obscuring some of the detail.

[6] Trooper Biehl wrote in his police report, drafted four days after the traffic stop
on January 19, 2015, that the second answer Ms. Johnson gave about the
location of her friend's house was "the east coast."  See Exhibit A, Docket No.
40-1.  He also wrote in his report that Ms. Johnson refused to tell him where
on the east coast she had been.  Id.  The video demonstrates that neither of

9

funeral she was going to—a little odd, certainly, that Trooper Biehl did not ask this question immediately when Ms. Johnson announced that she was going to a funeral.  Ms. Johnson told Trooper Biehl it was her mother's funeral she was going to attend.

Trooper Biehl then asked—again--if she had been visiting friends in Cape Cod.  Odd that he would ask this as Ms. Johnson already told him that she had been at a friend's house in Cape Cod.  He then asked her what she did out in California.  Her answer on the video is inaudible.  Trooper Biehl then asked if she had lived in California all her life.  She responded no, just for the last 15 years.

Trooper Biehl then commented that it looked like Ms. Johnson had just purchased her vehicle.  She said "yeah."  He asked her what her speedometer reading was at the time he pulled her over.  She stated 75 miles per hour. Trooper Biehl then said he registered her traveling at 78 miles per hour.  He commented that the tires on her vehicle might be a little big and may be throwing her speedometer off.  Trooper Biehl then asked if Ms. Johnson's mother had been sick.  She answered, but the response is indistinct on the video.  There is then a long silence while, presumably, Trooper Biehl is finishing writing out the courtesy speeding ticket.[7]

---

these written assertions are true.  The second answer Ms. Johnson gave about her friend's location was "Cape Cod."  See Exhibit B, Docket 40-2.  Therefore, the court makes its findings based on the video.

[7] Trooper Biehl wrote in his January 19, 2015, report that Ms. Johnson's voice "cracked" while talking to him in the patrol car.  See Exhibit A, Docket No. 40-1.  The court did not discern this while listening to the video.  Ms. Johnson's

At 15:11:23 Trooper Biehl handed Ms. Johnson the courtesy warning ticket.  He advised Ms. Johnson to adjust her speed downward a little to compensate for her tires.

At 15:11:26 Trooper Biehl announced to Ms. Johnson that he was a canine officer with his dog in the back seat.  He told Ms. Johnson his dog was trained to indicate to the odor of drugs.  At this point, one can hear Zara on the video begin whining—she has been largely silent up to this point on the video.  Trooper Biehl then asked Ms. Johnson if there was any reason his dog would alert to the smell of drugs in her vehicle.  Ms. Johnson said no.  Trooper Biehl then asked for consent to search Ms. Johnson's vehicle.  She said "no."

At 15:12:05 Trooper Biehl advised Ms. Johnson he was going to have his dog sniff her vehicle.  He then unloaded Zara from the patrol car.  When Trooper Biehl got Zara out of the back seat, she began barking incessantly and spinning around on the end of the leash.  Trooper Biehl commanded Zara "No bite! No bite!"[8]

He then walked Zara around Ms. Johnson's vehicle, saying "geef" a total of seven times as they walked, trailing the back of his hand along the side of the vehicle.  Zara barked continually and jumped on the car repeatedly.  At

voice was very subdued on the video, appropriately so if she had just experienced the death of her mother.  <u>See</u> Exhibit B, Docket No. 40-2.

[8] Trooper Biehl testified at the hearing he did not remember saying this, although he testified Zara would bite him or try to bite him sometimes.  He testified at the hearing that he may have given Zara the command "Stilstaan," which he pronounced "still-zine."  Upon listening to the video several times, the court concludes Trooper Biehl is saying "no bite."  According to Trooper Biehl, the video is the best evidence of what occurred at the traffic stop.

15:12:53, Zara had finished circumnavigating Ms. Johnson's vehicle.  She sat briefly directly in front of the passenger-side seam of the hatch-back door on Ms. Johnson's vehicle.

Trooper Biehl placed Zara back inside his patrol car and had a brief conversation with Ms. Johnson.  Ms. Johnson denied Zara had alerted to any drug odor and accused Trooper Biehl of harassing her.  She asked to be allowed to leave.  Trooper Biehl refused.

At 15:14:09 Trooper Biehl began searching Ms. Johnson's vehicle.  By 15:16:03 he had discovered a large amount of currency in the back of her vehicle.  At 15:17:05 Trooper Biehl placed Ms. Johnson in handcuffs.  No drugs were ever found in Ms. Johnson's vehicle.  Trooper Biehl explained this is because Zara indicates to the *odor* of drugs, not to drugs themselves.

Trooper Biehl testified his pre-dog-sniff contact with Ms. Johnson aroused his suspicion that she was involved in criminal activity.  In making this assessment, Trooper Biehl recited Ms. Johnson's shaking hands upon first encountering her, the fact that her answer about where she was traveling from was vague because she did not name the city initially (though she did later say "Cape Cod"), and that she was *driving* to a funeral, whereas Trooper Biehl thought she would want to *fly* in an airplane to arrive in California as quickly as possible.  Trooper Biehl also testified he observed Ms. Johnson's carotid artery pounding violently while she sat in the front seat of his car.  One's carotid artery is in one's neck.

12

Testifying at the hearing in this matter, Trooper Biehl stated Zara alerted several times to Ms. Johnson's vehicle and indicated at the rear hatch seam of Ms. Johnson's vehicle.  Lieutenant Sheldon viewed the video of this traffic stop and testified, in agreement with Trooper Biehl, that Zara did alert and did indicate to Ms. Johnson's vehicle.

Ms. Johnson was arrested and taken to the Brule County Sheriff's Office. Once there, Trooper Biehl hid the currency discovered in Ms. Johnson's vehicle in a desk drawer.   See Exhibit A, Docket No. 40-1.  Zara indicated to the drawer where the cash was hidden.  Id.  The circumstances of this endeavor are not known because they are not recorded in the report.

Lieutenant Scott Sheldon of the South Dakota Highway Patrol also testified.  Lt. Sheldon is the Special Operations Commander in charge of the Police Service Dog Unit, among other things.  He is responsible for training new dog-trooper teams, for ongoing training of such teams once initial certification is done, and for annual recertification.

Lt. Sheldon is involved initially in screening and selecting dogs who are good candidates for becoming drug detection dogs.[9]  One of the traits Lt. Sheldon looks for are objectively verifiable alert behaviors in a dog.  It is desirable to have a more obvious alert, but not completely necessary, he

---

[9] Lt. Sheldon also trains dogs who detect explosives and other substances. This opinion focuses only on the drug detection part of Lt. Sheldon's duties.

testified.  For those dogs that are selected, Lt. Sheldon then trains them along with their handlers, following the PSP manual.[10]

Lt. Sheldon was responsible for the initial training given to Zara and Trooper Biehl as well as their annual recertifications.  Although Lt. Sheldon has failed other dog-handler teams when they come up for recertification, he testified Zara has never failed to pass her recertification testing.

Lt. Sheldon echoed Trooper Biehl's testimony that Zara is trained to alert to the *odor* of drugs rather than to the presence of drugs themselves.  He reviewed the video of Trooper Biehl's traffic stop of Ms. Johnson and agreed Zara both alerted in the video and that she also indicated.  Lt. Sheldon testified a generally reliable dog may have a window of time when they are not reliable, as when a dog fails to pass recertification and then rehabilitates itself and later passes.  He also testified since dogs are living, breathing beings, he cannot ever guarantee there will be no mistakes.

## DISCUSSION

### A.    The Motion to Regulate Discovery

Ms. Johnson initially moved to regulate discovery.  See Docket No. 36. Her motion was based on the fact that she served the South Dakota Highway Patrol with a subpoena *duces tecum* on December 17, 2015, seeking a number

---

[10] "PSP" is an acronym for polizeispuerhundprufung, the training standard and certification for drug detection, explosive detection, and patrol dog canine teams as established by the international Congress of Police Service Dogs.  See Exhibit 5, page 2, item (16).  Google Translate indicates the term is German and that it translates into English as "police beagle test."  See https://translate.google.com/?ie=UTF-8&hl=en&client=tw-ob#auto/en/polizeisp%C3%BCrhund%20pr%C3%BCfung.

of records related to Zara's training, performance, and reliability. The Highway Patrol was to have produced the records subject to the subpoena on December 22, 2015. As of January 19, 2016, the Highway Patrol had neither responded to the subpoena by producing the requested records, nor had it moved to quash the subpoena. Ms. Johnson asked that the court order the Highway Patrol to produce the records, or in the alternative, hold that the evidence of Zara's alert and indication be unavailable to the government to resist the suppression motion.

The government represented the failure of the Highway Patrol to respond to the subpoena was inadvertent. The Highway Patrol provided the documents to Ms. Johnson and her counsel just a short time before the evidentiary hearing on Ms. Johnson's motion. The court granted Ms. Johnson's request to hold open the evidentiary hearing until she and her attorney reviewed the approximately 350 documents. Therefore, the late production of documents did not serve to prejudice Ms. Johnson. The court now denies the motion to regulate discovery as moot.

**B.    Was There Reasonable Suspicion for the Traffic Stop?**

The analysis of Ms. Johnson's motion to suppress requires the court to examine several stages of the encounter between her and Trooper Biehl. First, was there sufficient reason for Trooper Biehl to stop Ms. Johnson? Second, if so, was there reasonable suspicion to prolong the stop? Third, if there was no reason to prolong the stop, was the stop prolonged for a constitutionally insignificant period of time to allow Zara to sniff? Fourth, was there probable

15

cause to search Ms. Johnson's vehicle?   Each of these stages is analyzed chronologically below.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.  <u>See</u> U.S. CONST. amend. XIV.  When a police officer effects a traffic stop of a vehicle, that constitutes a seizure under the Fourth Amendment.  <u>Berkemer v. McCarty</u>, 468 U.S. 420, 436-37 (1984). If the traffic stop was initiated after a police officer observed a traffic violation, the seizure is justified under the Fourth Amendment so long as the seizure takes no longer than necessary to "address the traffic violation that warranted the stop and [to] attend to related safety concerns."  <u>Rodriguez v. United States</u>, ___ U.S. ___, 135 S. Ct. 1609, 1614 (2015).

Trooper Biehl testified here that he stopped Ms. Johnson for going three miles over the speed limit.  "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation.  'This is true even if a valid traffic stop is a pretext for other investigation.' "  <u>United States v. Sallis</u>, 507 F.3d 646, 649 (8th Cir. 2007) (quoting <u>Untied States v. Coney</u>, 456 F.3d 850, 855-856 (8th Cir. 2006) (quoting <u>United States v. Linkous</u>, 285 F.3d 716, 719 (8th Cir. 2002)).  A traffic stop "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot."  <u>United States v. Long</u>, 532 F.3d 791, 795 (8th Cir. 2008) (quoting <u>United States v. Chatman</u>, 119 F.3d 1335, 1339-1340 (8th Cir. 1997)). Exceeding the speed limit provides a justifiable reason for a traffic stop, even if the officer is acting on a tip that the vehicle is involved in transporting drugs

and said tip would not, by itself, provide justification for the stop.  Sallis, 507 F.3d at 649-650 (citing United States v. Stapleton, 10 F.3d 582, 583-584 (8th Cir. 1993)).  This is true even if the officer would not ordinarily stop a car exceeding the speed limit by only five to ten miles per hour.  Id.

Ms. Johnson, in her motion to suppress, does not question this basis for the initial traffic stop.  Based upon the officer's uncontested testimony at the hearing, then, this court finds that there was probable cause (a traffic violation) in support of the initial stop.  The initial stop was, therefore, legal.  Sallis, 507 F.3d at 649-650.

## C.  Did Prolonging the Stop Violate Ms. Johnson's Fourth Amendment Rights?

The question of the constitutionality of a traffic stop where the seizure is extended past the point of addressing the initial reason for the stop has changed in the Eighth Circuit following the Supreme Court's decision in Rodriguez.  Prior to Rodriguez, in the Eighth Circuit, even after the police had completed addressing the initial reason for the traffic stop, a further detention for purposes of having a dog sniff around the exterior of the vehicle was permissible so long as the further detention was not unreasonable.  See, e.g. United States v. Suitt, 569 F.3d 867, 873 (8th Cir. 2009).  Such extensions of the seizure of a vehicle and its occupants were, according to the Eighth Circuit, a *de minimis* intrusion on the suspect's personal liberty.  Id.  Thus, under Eighth Circuit case law prior to Rodriguez, prolonging the seizure for upwards of 10 minutes after the initial purposes of the stop were finished was approved. Rodriguez, 135 S. Ct. at 1614; United States v. Englehart, 811 F.3d 1034,

17

1041-43 (8th Cir. 2016). The relevant time frame to consider under this *de minimus* analysis is the time from when the original purpose of the stop was completed (usually when the ticket or warning ticket is issued) until the dog has completed its sniff. Id.

The Supreme Court overruled the Eighth Circuit's *de minimus* rule when it decided Rodriguez. Now, once the initial reason for the traffic stop is concluded *or reasonably should have been concluded*, the officer must release the suspect and is not allowed to continue to detain the vehicle while a drug dog sniff is conducted. Id. at 1614-16. For traffic stops that occurred in the Eighth Circuit before the Supreme Court decided Rodriguez (i.e. prior to April 21, 2015), the pre-existing case law continues to apply. Englehart, 811 F.3d 1040 n.1.

Alternatively, if during the period when the police officer was addressing the initial reasons for the traffic stop the officer forms a reasonable suspicion that criminal activity is afoot, the officer can prolong the seizure just long enough to investigate these reasonable suspicions.[11] United States v. Quintero-Felix, 714 F.3d 563, 567 (8th Cir. 2013). This standard is the "Terry stop" standard. Terry v. Ohio, 392 U.S. 1 (1968).

An officer making a Terry stop "must be able to articulate something more than an 'incohate and unparticularized suspicion or "hunch." ' " United

---

[11] Also, a prolonged traffic stop beyond the investigation of the original reason for the stop is constitutional if the continued encounter was consensual. Englehart, 811 F.3d 1040-42. Consent is not applicable here as Ms. Johnson clearly did not want to continue talking to the officer once she received her ticket.

States v. Sokolow, 490 U.S. 1, 7 (1989).  The Fourth Amendment requires "some minimal level of objective justification" for making the stop.  INS v. Delgado, 466 U.S. 210, 217 (1984).  The Court has held probable cause means " 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a Terry stop is obviously less demanding than for probable cause."  Sokolow, 490 U.S. at 7 (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "Police must have a 'particularized and objective basis' for suspecting criminal activity at the time the stop is made."  United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002).

"Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."  Alabama v. White, 496 U.S. 325, 330 (1990).  "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability.  Both factors–quantity and quality–are considered in the 'totality of the circumstances–the whole picture,' that must be taken into account when evaluating whether there is reasonable suspicion."  Id. at 330 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

### 1.    Was There Reasonable Suspicion to Prolong the Stop?

Trooper Biehl testified to numerous "indicia" supposedly displayed by Ms. Johnson that indicated excessive nervousness.  The officer testified these indicia gave him reasonable suspicion to extend the traffic stop once he finished with the initial purpose for the stop.

As discussed above, an officer must have reasonable suspicion to extend the traffic stop beyond the initial justification for the stop.  "The officer's reasonable suspicion cannot be . . . just a mere hunch or based on circumstances which 'describe a very large category of presumably innocent travelers.' "  United States v. Jones, 269 F.3d 919, 927 (8th Cir. 2001) (quoting Reid v. Georgia, 448 U.S. 438, 441 (1980)).

In Jones, the officer relied on four facts that he testified gave him reasonable suspicion:  (1) Jones slowed while the officer was passing him in his patrol vehicle, (2) Jones' camper wheels crossed traffic lines, (3) he gave an inconsistent answer about his prior arrest record, and (4) he acted nervously when being detained and questioned in the officer's patrol car.  Id. at 927.  The court held these facts did not support a finding of reasonable suspicion that criminal activity was afoot.  Id. at 929.

The court held "extreme and unusually nervous behavior observed in conjunction with only one or two other facts can generate reasonable suspicion," but, generally, "nervousness is of limited significance in determining reasonable suspicion." Id. at 928.  "Because the government

repeatedly relies on nervousness as a basis for reasonable suspicion, 'it must be treated with caution.' " Id. at 929.

Here, the court finds there was not reasonable suspicion to extend this traffic stop.  Although Trooper Biehl testified Ms. Johnson's hands shook when handing over her paperwork to him upon their initial encounter, that is not unusual.  All motorists experience a pang of fear and a rush of adrenaline upon seeing a police officer's lights in their rear view mirrors, even if they are wholly innocent of all but a traffic violation.  Furthermore, Trooper Biehl did not testify Ms. Johnson's hands continued to shake as their encounter played out.

The court rejects, as completely incredible, Trooper Biehl's testimony that he observed Ms. Johnson's carotid artery pounding violently. Ms. Johnson's entire neck was swathed in a thick scarf that was wound round her neck several times.  She also wore a heavy winter coat with a hood that bunched around her neck.  And she was wearing a winter hat that extended over her ears and partially covered her neck.  On the video of the traffic stop, no part of Ms. Johnson's neck below the jawline is visible at all.  Since Trooper Biehl did not testify that she disrobed her neck in his patrol car, the court concludes he could not see any part of Ms. Johnson's neck, let alone clearly observe her carotid artery.

It should be noted Ms. Johnson's lawyer explained his theory that Trooper Biehl could not have seen his client's neck well in advance of the evidentiary hearing in this matter.  Defense counsel supported his assertion with a still image from the video of the traffic stop.  If Trooper Biehl had some

explanation for how he was able to see Ms. Johnson's neck despite her clothing, he should have offered it up during his testimony. He did not do so. Furthermore, government counsel did not ask him to testify about the carotid artery evidence during his direct examination. The court concludes defense counsel may not be alone in doubting this assertion by Trooper Biehl.

The court finds Ms. Johnson's initial failure to recite the exact town on the East Coast that she was traveling from to be innocuous. She was in the middle of the Midwest when Trooper Biehl asked where she was coming from. She may well have thought Trooper Biehl would not know the town or city she was traveling from even if she stated it. She may have even permissibly thought it was none of Trooper Biehl's business. Furthermore, she did later state, the second time Trooper Biehl asked her, that she was returning from Cape Cod. In short, Ms. Johnson's answer is not the kind of red flag of evasiveness that would indicate criminal behavior.

Trooper Biehl also testified her demeanor and lack of talkativeness was suspicious. The court rejects this assessment. Ms. Johnson's voice is certainly subdued on the video, but that would be entirely appropriate if she had just learned of her mother's death.

Finally, Trooper Biehl conjectured if Ms. Johnson's story about returning to California for her mother's funeral were true, she would more likely have taken an airplane flight instead of driving across country so she could arrive sooner. But Trooper Biehl never asked Ms. Johnson why she was driving instead of flying. She may have had a perfectly good reason for doing so, such

22

as picking up a sibling en route, or that she did not plan to return to Cape Cod after the funeral and needed to drive so that she would not have to fly back and retrieve her vehicle.  This, too, is not inherently suspicious.

The court notes that Trooper Biehl's conversational skills were not altogether normal either.  Upon hearing that Ms. Johnson was traveling to a funeral, a normal response by another human being would have been—"who died?" or "I'm so sorry."  Instead, Trooper Biehl plowed ahead with other questions, leaving the awkward issue of who had died sitting there between them.  Also, *after* Ms. Johnson had already told Trooper Biehl she was coming from her friend's house in Cape Cod, Trooper Biehl asked her again who she had been visiting in Cape Cod.  Perhaps Ms. Johnson's discomfiture, if she was discomfited, was due to Trooper Biehl's poor conversational skills, not her own criminal behavior.  The court concludes no reasonable suspicion existed.

### 2.    Was the Prolonging of the Traffic Stop Unconstitutional Under Pre-<u>Rodriguez</u> Eighth Circuit Law?

Under pre-<u>Rodriguez</u> case law in the Eighth Circuit, even if reasonable suspicion did not support extending a traffic stop, a drug dog sniff conducted within 10 minutes after the original reason for the stop was completed was constitutionally permissible as a *de minimus* seizure.  <u>Englehart</u>, 811 F.3d 1040-43 (citing <u>United States v. Mohamed</u>, 600 F.3d 1000, 1005 (8th Cir. 2010) (five minutes); <u>United States v. Suitt</u>, 569 F.3d 867, 873 (8th Cir. 2009) (three minutes); <u>United States v. Robinson</u>, 455 F.3d 832, 834 (8th Cir. 2006) (less than 10 minutes); and <u>United States v. Alexander</u>, 448 F.3d 1014, 1017 (8th Cir. 2006) (four minutes)).

Here, the original reason for the traffic stop concluded at 15:11:23.  See Exhibit B, Docket No. 40-2.  The drug dog sniff concluded at 15:12:53.  Id. Therefore, the use of Zara extended the traffic stop by only one minute and thirty seconds (1:30).  Even if one extends the time frame and considers the delay from the time the initial reason for the stop was over (15:11:23) until the search in which the currency at issue in this case was discovered (15:16:03), only four minutes and forty seconds (4:40) elapsed.  Under pre-Rodriguez Eighth Circuit case law, this was clearly a constitutionally permissible, *de minimus*, delay.  See Englehart, 811 F.3d at 1040-43.  Therefore, the fruits of the search cannot be suppressed based upon the delay only.

**D.    Was the Search of Ms. Johnson's Vehicle Constitutional?**

The final issue presented by Ms. Johnson's motion to suppress is whether the search of her vehicle violated the Fourth Amendment.  The usual rule under the Fourth Amendment is that a valid search warrant supported by probable cause must first be obtained before a search is conducted.  California v. Carney, 471 U.S. 386, 390 (1985).  If a warrantless search is conducted, the government bears the burden of establishing that an exception to the warrant requirement applies.  United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005) (citing Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971)).

There are a number of exceptions to the warrant requirement, including the automobile exception.  Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam); United States v. Caves, 890 F.2d 87, 89 (8th Cir. 1989).  The Supreme Court has held the "ready mobility" of automobiles creates an

24

exigency that allows a warrantless search of an automobile where probable cause exists to believe that the vehicle contains contraband or evidence of criminal activity.  Labron, 518 U.S. at 940; Caves, 890 F.2d at 89.  Aside from the mobility of cars, the automobile exception to the warrant requirement is also supported by the fact that citizens have a reduced expectation of privacy in an automobile because automobiles are subject to pervasive regulation. Labron, 518 U.S. at 940 (citing Carney, 471 U.S. at 390-391); Caves, 890 F.2d at 89.

If probable cause exists in support of the automobile exception, the search may encompass the entire passenger compartment of the automobile, its trunk, and all containers, packages, and compartments located in the vehicle so long as there is probable cause to believe that the object of the search may be found there.  Englehart, 811 F.3d at 1042; Caves, 890 F.2d at 90.  Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity."  United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (citing United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997), (quoting Illinois v. Gates, 462 U.S. 213, 243-244 n.13 (1983))).  "A police officer has probable cause to conduct a search when 'the facts available to [him] would "warrant a [person] of reasonable caution in the belief" ' that contraband or evidence of a crime is present." Florida v. Harris, ___ U.S. ___, 133 S. Ct. 1050, 1055 (2013) (citations omitted). "Probable cause" cannot be reduced to a "precise definition or quantification." Id.  In determining if probable cause existed in support of a search, courts

25

evaluate the totality of the circumstances.  Id.  "[R]igid rules, bright-line tests, and mechanistic inquiries" have no place in the probable cause determination, which is evaluated according to a "flexible, all-things-considered approach."  Id.

The Harris Court held an alert of a drug dog to a vehicle during a traffic stop may provide probable cause to search the vehicle *if* the drug dog is reliable and the alert is reliable under the circumstances.  Id. at 1056-57.  In determining whether the drug dog is reliable and whether its alert was reliable under the circumstances, courts should not apply an "inflexible" set of rigid requirements in every case, but instead should consider relevant facts under the circumstances.  Id. at 1056.  Such factors to consider may include "evidence of a dog's satisfactory performance in a certification or training program," whether the dog "has recently and successfully completed a training program that evaluated his proficiency in locating drugs," and "evidence of the dog's (or handler's) history in the field . . . may sometimes be relevant."  Id. at 1057.

Even if the dog is shown to be generally reliable, "circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions."  Id. at 1057-58.  "The question . . . is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."  Id. at 1058.

26

Here, the court pauses for an aside.  Justice Kagan wrote for a unanimous Court in Harris that a generally reliable drug dog which alerts under circumstances indicting the alert is reliable provides probable cause for a search.  Id. at 1056-57.  But the record in this case is replete with evidence that Zara alerts **not** to the presence of actual drugs, but to the **odor** of drugs.  If this were a fact that escaped the notice of the Harris Court, there might be room for this court to distinguish the Harris holding from this case.

However, the Harris opinion is replete with references to the fact that Aldo, the dog in that case, alerted only to the **odor** of drugs, just like Zara.  See, e.g. Harris, 133 S. Ct. at 1058.  But here is the nuance this fact raises that the Harris Court failed to acknowledge or discuss:  If a dog is trained to indicate only to the *odor* of contraband, how can one conclude that an indication means the contraband itself is more probably than not present in that location?  After all, it is not a crime to have the **odor** of contraband in one's car and finding such an odor does not result in police obtaining evidence of a crime.  Instead, it is only the possession of the **contraband itself** that gives rise to a crime and evidence of a crime.  The Fourth Amendment requires probable cause of **evidence of a crime**.

However, this court is at "the bottom of the totem pole" in the federal judiciary.  It is bound to follow decisions of courts above it.  The Supreme Court has held that a reliable drug dog alert indicating the presence of the **odor** of drugs gives rise to probable cause for a search of the place indicated.

27

This court is bound by that holding, even if it appears an oversimplification of the analysis.

The court turns, then, to the question whether Zara is reliable and whether her indication to Ms. Johnson's vehicle on January 15, 2015, was reliable. Defense counsel correctly posits that Zara's indication is the sole fact upon which the probable cause determination rises or falls. He characterizes her indication as a legally and factually marginal circumstance, lasting only for 25 seconds. This, counsel posits, is too slender a reed to support the search of his client's vehicle.

The court first addresses whether Zara is generally reliable. The voluminous records of Zara's performance, both in the field and in controlled exercises, shows she is reliable. Defense counsel argues that a one-third error rate shows Zara is not reliable (i.e. 32% of the time Zara indicates and no drugs are found). However, the court is mindful the standard here is probable cause, not preponderance of the evidence, and not beyond a reasonable doubt. Courts and lawyers frequently describe preponderance of the evidence as 51%-- if the party with the burden adduces only slightly more evidence than the opposing party, she has satisfied her burden.

Here, the standard is much lower—probable cause. And Zara's record of performance is much higher than 51%. In 68% of the circumstances in which she indicated, actual narcotics were found. In addition, the conundrum of the **odor** issue raises its ugly head here too—since humans cannot sense the odor dogs can and humans cannot see it, feel it, taste it, or otherwise verify its

28

existence, and since Zara indicates only to odor, who is to say her success rate isn't actually much higher than 68%?  The court concludes that Zara is generally reliable.

The court must also examine the reliability of Zara's indication in circumstances of this case.  Trooper Biehl did not deny he and Zara are a team, and that he is an active participant in the sniff endeavor.  He does not passively lead Zara around a car waiting to see her reaction.  In a very real sense, he "cues" her.  He tells her "it's time to search now, pay attention" by saying "geef."  He draws his hand around the vehicle as he walks before Zara. He watches for her to "alert"—those subtle, nearly-unnoticeable behaviors that only the handler can usually observe.  Then he leads Zara back to places he has seen her alert to see if she will indicate there.[12]  Finally, he gives Zara positive feedback if she does indicate, whether he knows if the indication is valid or not.  The <u>Harris</u> opinion misses this part of the equation too, focusing only on the dog as though it were an infallible Geiger counter, which it certainly is not.

That Trooper Biehl and Zara work as a cooperative team is not, in itself however, evidence that their results are untrustworthy.  As indicated above, Trooper Biehl never works with any other drug detection dog than Zara, and Zara never works with any other officer than Trooper Biehl.  That means the training records discussed above are indications of the reliability of ***both*** of them as a team.  In other words, the records are not just indicative of Zara's

---

[12] Trooper Biehl testified he did not use this step, sometimes called "metering," at Ms. Johnson's traffic stop.

reliability, they are indicative of the reliability of Zara and Trooper Biehl working as a team.  The same analysis applies.  A 68% rate of success by the dog-man team is supportive of probable cause.

What other circumstances were there at this particular indication at this traffic stop?  Zara was barking and jumping around, but that is apparently typical behavior for her.  Trooper Biehl described her as "high strung."  She did not appear distracted in the video, say, by a passing rodent, car, or person.  It was winter time, so scents would not be magnified as they would under intense heat.  There was no evidence introduced to indicate it was unusually windy on January 15, 2015, at the site of the stop.  Trooper Biehl did cue Zara to search by saying "geef" and he did trail the back of his hand along Ms. Johnson's car to show Zara where he wanted her to focus her attention, but this is, again, something he always does.  He did not direct Zara to concentrate unduly on any particular spot on the vehicle.  There was no evidence introduced that there was any unusual odor or scent at the scene—on Trooper Biehl's gloves, in the nearby ditch, on the outside or inside of Ms. Johnson's vehicle—that would have thrown Zara's nose off.  The court was unable to detect any "alerts" by Zara, but both troopers who testified said she did "alert."  The court *was* able to see with its own eyes on the video that Zara did "indicate" by sitting briefly.

There was testimony at the first hearing regarding the issue of cash in general circulation that is tainted with the odor of drugs.  This would be relevant to this case because it is cash to which Zara apparently indicated.  However, each witness who testified had a different opinion regarding whether

a drug dog would alert to such generally-tainted cash. This subject is the focus of a hotly-contested debate among experts. See generally United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d 448, 455 (7th Cir. 2005) (stating "it is a matter of some scientific debate whether dogs alert only to cocaine itself [on tainted currency], or rather to the odor of a cocaine byproduct, such as methyl benzoate. Thus the critical question is not whether most currency in general circulation is tainted with cocaine, but whether the cocaine itself is what triggers dog alerts to currency. If properly trained dogs alert to cocaine . . . then . . . dog alerts to currency would have little or no probative weight if it can be shown that most currency is 'innocently' tainted with detectable levels of cocaine. [But] if dogs alert to methyl benzoate as opposed to cocaine per se, and the byproduct is volatile enough to evaporate from the currency [quickly], than a dog alert . . . would be more probative.").

No expert evidence was introduced on this subject in this case. The two witnesses who did testify disagreed with one another. Therefore, the court draws no conclusions from the fact that Zara alerted to cash, as opposed to some other item.

This court concludes Zara is generally reliable and her indication in this case was generally reliable. Therefore, her indication provided probable cause for the search of Ms. Johnson's vehicle. Harris, 133 S. Ct. 1056-57. Finally, then, the court recommends that Ms. Johnson's motion to suppress be denied in its entirety.

31

## CONCLUSION

This magistrate judge respectfully recommends that defendant Angela Johnson's motion to suppress [Docket No. 35] be denied.  The court also denies as moot Ms. Johnson's motion to regulate discovery [Docket No. 36].

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED March 11, 2016.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge