UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ANGELA MARIE JOHNSON,<br><br>Defendant. | 4:15-CR-40056-KES<br><br>ORDER ADOPTING AND MODIFYING<br>REPORT AND RECOMMENDATION |

**NATURE AND PROCEDURE OF CASE**

Defendant, Angela Marie Johnson, is charged with interstate travel in aid of a racketeering enterprise under 18 U.S.C. § 1952(a)(1). Johnson moves to suppress all physical evidence seized from her vehicle during a traffic stop. Johnson contends that the evidence was obtained in violation of the Fourth Amendment to the United States Constitution. Docket 35. The motion was referred to a United States magistrate judge for a report and recommendation under 28 U.S.C. § 636(b)(1)(B).

Evidentiary hearings were held on February 4, 2016, and March 10, 2016. Two witnesses testified and a number of exhibits were received at the hearings. The magistrate judge issued a report and recommended denial of Johnson's motion to suppress. Docket 61. Both Johnson and the government filed objections to the report and recommendation. Docket 69; Docket 70. For the following reasons, the court adopts and modifies the report and recommendation.

## LEGAL STANDARD

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1)(A); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTS

According to the testimony given and the exhibits introduced at the evidentiary hearings, the pertinent facts are as follows:

Trooper Brian Biehl is a police service dog handler for the South Dakota Highway Patrol (SDHP). He testified that he has been employed by the SDHP for fifteen years and has been a canine officer since 2011. Trooper Biehl works with Zara, a drug detection dog. Trooper Biehl has only worked with Zara, and Zara has only worked with Trooper Biehl. They have been certified and have operated as a team since August 2011. Trooper Biehl and Zara undergo yearly recertification training. Their most recent recertification prior to this incident came in October 2014. Trooper Biehl and Zara also train together on a weekly basis.

2

Trooper Biehl testified that Zara is trained to detect the odor of drugs, not necessarily the physical presence of drugs. More specifically, Zara is trained to detect the odor of marijuana, methamphetamine, cocaine, mushrooms, and ecstasy. Docket 53 at 11. Trooper Biehl explained that Zara will display two distinct behaviors when she detects drug odors. First, Zara will give an "alert," which Trooper Biehl described as natural, unlearned behavior manifested by "a difference . . . in [Zara's] breathing pattern or a head check or something like that." *Id.* Zara may also alert by displaying an increased search intensity or by becoming more excited. But Trooper Biehl explained that Zara is "pretty high strung" and that she can alert quickly and subtly. *Id.* at 17. An alert by itself does not, however, mean that the odor of drugs are present because "an alert can be just that there was a different odor there that [Zara] wasn't used to." *Id.* at 32. Rather, Zara will "indicate" when she detects drug odors by "sit[ting] and star[ing] in the area where the strongest odor is coming from." *Id.* at 11. Trooper Biehl testified that "[y]ou need to have an alert prior to a valid indication." *Id.* Unlike an alert, however, an indication is a trained behavior. According to Trooper Biehl, Zara's alert can be difficult for an untrained individual to detect, but an indication is "very easy to see" once the dog's trained behavior is known. *Id.* at 12.

Trooper Biehl explained that Zara can react to certain words and phrases. Trooper Biehl acknowledged that he tends to deliver "the same sort of canned speech when [he] break[s] it to the driver that [he'd] like to walk the dog around the vehicle[.]" *Id.* at 28. He agreed that Zara can recognize those words and that she becomes more excited. *Id.* at 28-29. Trooper Biehl likewise agreed that his words can act as "cues" to Zara "about what's supposed to happen next." *Id.* at 29.

3

Trooper Biehl testified that he uses the word "geef" as a signal to Zara that they are working and for her to begin sniffing. *Id.* at 28. He explained that he will place his hand near an area where he wants Zara to check. *Id.* at 27. Trooper Biehl testified that he gives Zara verbal praise when she indicates, such as "good girl" or "good geef," and that he pretends to throw a toy away from the vehicle to get Zara back into his patrol car. *Id.* at 29-30.

Trooper Biehl observed Johnson travelling west across Interstate 90 in South Dakota on January 15, 2015. He initiated a traffic stop, and the stop was recorded by Trooper Biehl's dashboard camera. A copy of that video is designated as Exhibit B in the record. The court has reviewed the video, and finds the following facts were proven by the greater weight of the evidence:

Johnson pulled over onto the right-hand shoulder of the Interstate. She is fully stopped by 15:05:15 on the video. Her vehicle has California license plates. Trooper Biehl approached her vehicle from the passenger side and asked Johnson for her license and registration. He also asked where Johnson lives. She replied, "Oceanside."

Trooper Biehl told Johnson that he was going to issue a warning ticket to her. He explained that Johnson was driving in excess of the speed limit. Trooper Biehl asked Johnson to step out of her vehicle and to come back to Trooper Biehl's patrol car. Although Johnson's response is inaudible, Trooper Biehl replied that "that's how we do it here. Just come on back to the car with me for a minute." *See* Exhibit B at 15:06:18-21.

Johnson's path to the passenger seat of Trooper Biehl's patrol car took her directly through the dashboard camera's field of view. A still-frame image of

4

Johnson taken from 15:06:31 on the video also appears in the record as Exhibit C. Johnson is wearing a long-sleeve winter coat and a stocking cap pulled down over her ears. She is also wearing a knitted scarf that is wrapped around her neck several times. Her neck is concealed from view by the scarf.

Inside the patrol car, Trooper Biehl asked Johnson how she was doing. Johnson replied that she was on the way to a funeral. Trooper Biehl asked where the funeral was being held. Johnson responded, "Oceanside." Trooper Biehl asked where Johnson was coming from. Johnson responded, "A friend's house." Trooper Biehl asked if Johnson's friend lived in South Dakota. "No," Johnson explained, her friend lived in "Cape Cod." Trooper Biehl remarked that "that's a long way away" and asked how long Johnson had been out there. Johnson replied that she was in Cape Cod for about a week. Trooper Biehl then asked whose funeral Johnson was attending, and Johnson explained that it was her mother's funeral. Trooper Biehl replied that he was sorry to hear that. *See* Exhibit B at 15:05:41–15:07:20. After several seconds of silence, Trooper Biehl repeated his question and asked if she was visiting friends in Cape Cod. Johnson replied "yeah."

Trooper Biehl asked what Johnson did back in California. Her response is inaudible. Trooper Biehl inquired if she had lived in California all her life. Johnson responded "no," but said that she had lived there for about fifteen years. She added that her husband takes care of developmentally disabled people. *See* Exhibit B at 15:07:48–15:08:41.

Trooper Biehl asked if Johnson had recently purchased her vehicle. Johnson responded affirmatively. Trooper Biehl asked how fast her speedometer said she was going, and Johnson responded "seventy-five." Trooper Biehl explained

5

that he recorded her speed at seventy-eight, and opined that the size of Johnson's tires could be throwing off her speedometer. Trooper Biehl then asked if Johnson's mother had been sick, but Johnson's response is inaudible. *See* Exhibit B at 15:08:52–15:09:55.

A period of silence follows the previous exchange. It is broken at 15:11:15 on the video. Trooper Biehl informed Johnson that he is only writing her a warning ticket. He advised her to reduce her speed a few miles per hour to compensate for her large tires. Trooper Biehl then advised Johnson that he is a canine officer with the South Dakota Highway Patrol. He explained that his dog is trained to indicate to the odor of drugs, but not necessarily to the presence of drugs themselves. Although Zara has been mostly quiet until this point, she began to bark and whine after Trooper Biehl mentioned the specifics of her training. *See* Exhibit B at 15:11:15–33.

Trooper Biehl asked if there would be any reason that his dog would indicate to the odor of drugs coming from Johnson's vehicle. Johnson replied, "absolutely not." Trooper Biehl inquired if Johnson had any prescription drugs or large amounts of currency in the vehicle. Johnson again replied, "absolutely not." Trooper Biehl asked if Johnson would consent to a search of her vehicle. Johnson refused. Trooper Biehl then explained that he would walk his dog around the outside of the vehicle. Zara can be heard in the background at this point whining and barking. *See* Exhibit B at 15:11:33–59.

Trooper Biehl and Zara come into view of the dashboard camera at 15:12:28. Zara was on a leash. Trooper Biehl commanded Zara "No bite! No bite!" and walked her to the rear, driver's side of Johnson's vehicle. They completed a

counter-clockwise circle around the vehicle in approximately fifteen seconds. Zara can be heard barking continuously and is seen jumping up repeatedly on the side of the vehicle along the way. As they walked, Trooper Biehl said the word "geef" several times. He also held Zara's leash with one hand and trailed the back of his other hand along the outside of the vehicle. *See* Exhibit B at 15:12:28–50.

Zara continued to bark and whine after the circle was completed. She then sat for less than a second near the rear, driver's side seam of the trunk. Zara was taken to the rear, passenger's side seam of the trunk and similarly sat momentarily. Trooper Biehl then returned Zara to the back of his patrol car. *See* Exhibit B at 15:12:50–15:13:00. A few moments later, Trooper Biehl reengaged Johnson inside his patrol car. He asked where she bought the vehicle. Johnson told Trooper Biehl that she bought it from a dealership in California.

Trooper Biehl reiterated that his dog indicates to the odor of drugs but not necessarily to their presence. Zara can again be heard whining. Johnson disputed both Zara's abilities and that Zara indicated at all. Johnson accused Trooper Biehl of harassing her and asked if he would leave her alone. Trooper Biehl refused and told Johnson that he had to do his job. *See* Docket 15:13:24–47.

At 15:14:07 on the video, Trooper Biehl approached the passenger side door of Johnson's vehicle. He opened it as well as the rear passenger door and began to look around the inside. At 15:14:58, Trooper Biehl repositioned himself at the trunk of the vehicle. He opened the trunk and looked around the inside. At some point, Trooper Biehl discovered a large amount of currency during his search of the trunk. It is taken out and held up to the dashboard camera at 15:17:47.

Trooper Biehl testified that he observed Zara alert when her sniffing became more intense and when she gave a glance or "head check" toward the back of Johnson's vehicle. Docket 53 at 25. He testified that Zara indicated twice by sitting down near the rear driver and passenger side seams of the trunk. *Id.* at 15. Lieutenant Scott Sheldon, a special operations commander for the SDHP and a supervisor of the canine unit that includes Trooper Biehl and Zara, also testified at the first evidentiary hearing. Lieutenant Sheldon testified that he is involved initially in selecting and screening potential drug dogs. He has worked both with Trooper Biehl and Zara, and was involved in their training. *Id.* at 40. He viewed the January 15, 2015 video and opined that Zara properly alerted and indicated. *Id.* at 47.

## DISCUSSION

The Fourth Amendment generally requires that law enforcement officers secure a warrant before conducting a search of a person's property. *See, e.g.*, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011); *Smith v. Ohio*, 494 U.S. 541, 542 (1990). There are several, albeit limited, exceptions to the warrant requirement. *See, e.g.*, *United States v. Karo*, 468 U.S. 705, 717 (1984). For example, an officer may search a vehicle without first obtaining a warrant if the officer has probable cause to believe the vehicle contains contraband or evidence of a crime. *United States v. Ross*, 456 U.S. 798, 807-09 (1982) (citing *Carroll v. United States*, 267 U.S. 132, 161-62 (1925)). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005) (citing *Illinois v. Gates*,

8

462 U.S. 213, 238 (1983); *United States v. Gleich*, 397 F.3d 608, 612-13 (8th Cir. 2005)). And while "the burden of proof is on the defendant who seeks to suppress evidence," the burden is "on the government to justify a warrantless search." *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984); *see also United States v. Hughes*, 517 F.3d 1013, 1019 (8th Cir. 2008).

I.      **The Initial Traffic Stop**

Neither Johnson nor the government objected to the magistrate judge's determination that the initial traffic stop was lawful. "A traffic violation, no matter how minor, provides an officer with probable cause to stop the driver." *United States v. Coleman*, 700 F.3d 329, 334 (8th Cir. 2012). "This is true even if a valid traffic stop is a pretext for other investigation." *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (internal citation and quotation omitted). There is no dispute that Trooper Biehl initiated the traffic stop because he determined that Johnson was driving three miles-per-hour in excess of the posted speed limit. Thus, the magistrate judge found that Trooper Biehl had probable cause to stop Johnson. This court agrees.

II.     **Drug Dog Sniff and the Search of Johnson's Vehicle**

A.      **Was Zara's Deployment Permissible?**

In *United States v. Caballes*, 543 U.S. 405, 407 (2005), the Supreme Court held that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Included within the time reasonably required to complete the stop are " 'a number of routine but somewhat time-consuming tasks related to the traffic violation' " such as " 'a computerized

check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning.' " *United States v. Ovando-Garzo*, 752 F.3d 1161, 1163 (8th Cir. 2014) (quoting *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012) and *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013)). "Once this initial investigation is finished, however, the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, 'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention' or unless the continued encounter is consensual." *United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007) (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)).

Prior to the Supreme Court's ruling in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), it was settled law in the Eighth Circuit that an officer could deploy a drug dog within a short time after the completion of a traffic stop so long as the additional delay amounted to no more than a *de minimis* intrusion on an individual's personal liberty. *See, e.g.*, *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 649 (8th Cir. 1999); *United States v. Martin*, 411 F.3d 998, 1002 (8th Cir. 2005). Drug dog sniffs that were conducted within approximately ten minutes after the original purpose for the traffic stop had ended were found by the Eighth Circuit to be *de minimis* intrusions. *See, e.g.*, *$404,905.00 in U.S. Currency*, 182 F.3d at 649 (two minutes); *United States v. Mohamed*, 600 F.3d 1000, 1005 (8th Cir. 2010) (five minutes); *United States v. Robinson*, 455 F.3d 832, 834 (8th Cir. 2006) (less than ten minutes). And the officer was not required to demonstrate reasonable suspicion or any other prerequisite justifying the drug dog's deployment. *See Robinson*, 455 F.3d at 834.

The Supreme Court's holding in *Rodriguez* overruled this body of caselaw and held that absent reasonable suspicion an officer's extension of a traffic stop in order to conduct a dog sniff violates the Fourth Amendment. *Rodriguez*, 135 S. Ct. at 1615. The Court's *Rodriguez* opinion, however, was not decided until April 21, 2015. The events giving rise to Johnson's case occurred on January 15, 2015, and therefore preceded *Rodriguez* by three months. Thus, the Eighth Circuit's pre-*Rodriguez* caselaw governs whether Trooper Biehl's use of the drug dog was lawful. *See United States v. Englehart*, 811 F.3d 1034, 1040 n.1 (8th Cir. 2016) (explaining that "we apply the law of the circuit as it existed at the time of the stop").

Here, neither Johnson nor the government objected to the magistrate judge's determination that Trooper Biehl's deployment of Zara was *de minimis* under the Eighth Circuit's pre-*Rodriguez* caselaw. The magistrate judge found that approximately one minute and thirty seconds elapsed from the time that Johnson received a warning ticket to the time that Zara finished sniffing Johnson's vehicle. Docket 61 at 24. Alternatively, the magistrate judge found that roughly four minutes and forty second elapsed from the time that Johnson received a warning ticket to the time that the currency was discovered. *Id.* Under either metric, the magistrate judge found that Zara's deployment was a *de minimis* intrusion on Johnson's liberty and therefore permissible. This court agrees. Because the Eighth Circuit's pre-*Rodriguez* caselaw permitted officers to conduct dog sniffs almost ten minutes after the reason for the initial stop had ended, the use of Zara in this case was *de minimis*. [1]

---

[1] The report and recommendation analyzed in the alternative whether Trooper Biehl had reasonable suspicion to prolong the traffic stop in the

11

**B.    Did Trooper Beihl Have Probable Cause to Search Johnson's Vehicle?**

In *Florida v. Harris*, 133 S. Ct. 1050, 1053 (2013),[2] the Supreme Court "consider[ed] how a court should determine if the 'alert' of a drug-detection dog during a traffic stop provides probable cause to search a vehicle." The Court explained that its probable cause inquiry for cases involving drug detection dogs was functionally no different than for criminal cases generally. *Id.* at 1055 (noting that probable cause is a "practical and common-sens[e] standard" that "look[s] to the totality of the circumstances" available to the officer). Thus, "[t]he question— similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 1058. The drug detection dog must, however, be reliable in general and in the particular case before the court. *Id.* at 1057-58.

As to a dog's general reliability, the Court opined that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 1057. By contrast, the Court declined to treat the records of a dog's performance in the field "as the gold standard in evidence" for several reasons. *Id.* at 1056. The Court explained that

---

absence of deploying Zara. Docket 61 at 20-23; *see Quintero-Felix*, 714 F.3d at 567. The government objected to that portion of the report and recommendation. Because the Eighth Circuit's pre-*Rodriguez* caselaw permitted Trooper Biehl to extend the traffic stop in order to deploy Zara without reasonable suspicion, the court does not adopt the alternative justification for prolonging the stop.

[2] The government objected to the magistrate judge's interpretation of *Harris*. The court has reviewed the *Harris* opinion de novo.

12

> Errors may abound in such records. If a dog on patrol fails to alert to
> a car containing drugs, the mistake usually will go undetected
> because the officer will not initiate a search. Field data thus may not
> capture a dog's false negatives. Conversely (and more relevant here), if
> the dog alerts to a car in which the officer finds no narcotics, the dog
> may not have made a mistake at all. The dog may have detected
> substances that were too well hidden or present in quantities too
> small for the officer to locate. Or the dog may have smelled the
> residual odor of drugs previously in the vehicle or on the driver's
> person. Field data thus may markedly overstate a dog's real false
> positives. By contrast, those inaccuracies—in either direction—do not
> taint records of a dog's performance in standard training and
> certification settings. There, the designers of an assessment know
> where drugs are hidden and where they are not—and so where a dog
> should alert and where he should not. The better measure of a dog's
> reliability thus comes away from the field, in controlled testing
> environments.

*Id.* at 1056-57. And regarding a dog's reliability in a particular case, the Court

explained that "circumstances surrounding a particular alert may undermine the

case for probable cause—if, say, the officer cued the dog (consciously or not), or if

the team was working under unfamiliar conditions." *Id.* at 1057-58.

### 1.    Zara's general reliability

The magistrate judge observed that "[t]he voluminous records of Zara's

performance, both in the field and in controlled exercises, shows she is reliable."

Docket 61 at 28. Regarding the records of Zara's certification and training, the

magistrate judge found that

> In July 2011, [Trooper Biehl] and his dog, Zara, went through initial
> training in order to certify Zara as a drug detection dog. Zara is a
> Malinois breed of dog. She and Trooper Biehl were certified as a drug
> dog detection team in August, 2011. Since that time, Zara and
> Trooper Biehl have undergone annual recertification, always
> successfully. In addition, they train two full days per month with
> other troopers who are police service dog handlers. Trooper Biehl also
> tries to train Zara on additional days as their schedule allows. . . .
> Zara's most recent recertification before the traffic stop at issue in
> this case took place in October, 2014.

*Id.* at 2-3. As to the records of Zara's field deployment, the magistrate judge

found that

> These records indicate that out of 410 deployments of Zara, she gave
> an indication to the presence of drugs 241 times. Of these 241
> occasions when Zara [indicated], there were 78 times where no drugs
> were found. Thus, conversely, on 241 occasions when Zara indicted,
> drugs were found 163 times. On 60 of these 163 occasions when
> drugs were found, the drugs present were in such small quantities
> that they could not be measured or weighed. From these statistics,
> one can conclude that 68% of the time when Zara indicated to the
> presence of drugs, some drugs in some quantity were found. Thirty-
> two percent of the time when she indicated, no drugs were found. The
> incident in this case is recorded in these records of Zara's
> performance. Her performance in this case is classified as one of the
> times she indicated and no drugs were found.

*Id.* at 6. The magistrate judge concluded, based on all of these records, that Zara

was generally reliable.

### a.     the government's objections

The government agrees with the magistrate judge's finding that Zara is

generally reliable. The government objects, nonetheless, to the magistrate judge's

methodology.

The government first argues that the magistrate judge failed to consider

Zara's training records and repeated success achieving certification as a drug dog.

The court disagrees. The Supreme Court in *Harris* observed that evidence of a

dog's satisfactory performance in a certification or training program generally

serves as a good indicator of the dog's reliability. The report and recommendation

specifically cited that portion of the *Harris* opinion. Docket 61 at 26 (citing *Harris*,

133 S. Ct. at 1057). And as quoted in section II.B.1, *supra*, the magistrate judge

noted Zara's performance records "both in the field *and in controlled exercises*," as

well as the fact that Zara has undergone annual recertification since 2011, always

successfully. *See* Docket 61 at 2-3, 6. The court is satisfied that the magistrate judge considered Zara's training records and records of Zara's annual recertification. Thus, the government's objection is overruled.

Next, the government objects to the magistrate judge's calculations concerning Zara's performance records. A large volume of these records were introduced at the evidentiary hearing, and Trooper Biehl explained how to read the records. He explained that a score from 1-6 is entered in the "Indication" column if Zara indicates during a training exercise or in the field. Docket 63 at 10. He clarified that a lower score is desirable. *Id.* at 17. Trooper Biehl explained that an entry of "N/A" in the "Indication" column means that Zara did not indicate. *Id.* at 11. Trooper Biehl testified that he enters a value correlating to weight in the "Quantity of Narcotic" box when drugs are found (or present in training). *Id.* at 12. Trooper Biehl explained that an entry of "N/A," "unknown," "nothing," or a blank box means that no drugs were found or present. *Id.* at 14. And he testified that "UA," "trace," or "residue" means that some drugs were found or present but not in a sufficiently measurable quantity. *Id.* at 15.

The court has reviewed the records submitted to the magistrate judge.[3] The court modifies the report and recommendation as follows: The records show that

---

[3] The government submitted additional records of Zara's performance after the report and recommendation was issued. These records were not offered to the magistrate judge for consideration. This court may, in its discretion, receive evidence not presented to the magistrate judge. *United States v. Hayden*, 759 F.3d 842, 846 (8th Cir. 2014). The records received by the magistrate judge begin on August 10, 2011. The supplemental records begin on June 22, 2011, and consist primarily of earlier training records. The court has reviewed the supplemental records and finds that they do not alter its conclusion regarding Zara's reliability.

15

Zara was deployed in the field 411 times.[4] Zara indicated during those deployments to the odor of drugs 243 times. Of Zara's 243 indications, drugs were actually found 166 times. Although the tallies in the report and recommendation are slightly different than the totals found by this court, the final calculation is the same: drugs were actually found approximately 68% of the time when Zara indicated during a deployment in the field. Additionally, there are 213 training entries in the records.[5] Zara indicated to the odor of drugs 204 times in training. Of those 204 indications, it appears that Zara mistakenly indicated once. *See* Defendant's Exhibit 31 (third entry from July 25, 2012). Zara's accuracy in training, therefore, is between 95-99%.[6] Thus, the government's objection is granted to the extent that this court has made its own review and calculation of Zara's records.

Finally, the government objects to what it perceives as the magistrate judge's undue emphasis on whether drugs were actually found in the field following one of Zara's indications. According to Trooper Biehl, Zara indicates to the odor of drugs and not necessarily to their presence. The government, therefore, argues that the presence of drugs has no bearing on whether Zara correctly detected an odor of drugs.

_____

[4] Defendant's Exhibit 43 includes an entry that Zara was deployed on a warrant. The court includes the warrant deployment as part of this total. Zara did not indicate during that deployment, and no drugs were found.

[5] There are also twelve "Exam" entries in the record. Trooper Biehl was not asked about the meaning of those entries.

[6] Trooper Biehl was not asked about the training entries where Zara did not indicate. If drugs were present during all 213 training exercises, Zara's training accuracy would be 95%. If drugs were present 203 times, by comparison, Zara's training accuracy would be 99%.

The Court in *Harris* explained that the eventual presence or absence of drugs does not necessarily mean that the drug dog made a mistake because the dog could have detected the odor of drugs in quantities that were too small to be located or that were too well hidden to be found. *Harris*, 133 S. Ct. at 1056. Likewise, the Court explained that the dog could have detected a residual odor from drugs that were no longer physically present. *Id.* And the Court opined that an otherwise reliable drug dog's detection of drug odors established probable cause to conduct a search. *Id.* n.2.

The report and recommendation analyzed the interplay between *Harris*'s reliability discussion and a court's probable cause determination. Docket 61 at 26-27. The report and recommendation also expressed skepticism of the Court's holding as it applied to a drug dog's detection of odors. *Id.* at 27. The magistrate judge, nonetheless, applied the holding from *Harris*. *Id.* In doing so, the report and recommendation gave Johnson the most favorable view of Zara's reliability. That is, the report and recommendation used the figure correlating to the number of occasions when Zara indicated in the field and where drugs were actually found, *i.e.*, 68%. *Id.* at 28. Using that figure, and considering Zara's training records and certification successes, the report and recommendation concluded that Zara was generally reliable. *Id.* at 29.

Although the Court in *Harris* cautioned against relying solely on evidence of a dog's in-field performance, this court is satisfied that the report and recommendation viewed those records as only one piece of the evidence before it. As noted above, the magistrate judge also considered Zara's other records before determining that Zara was generally reliable. Additionally, the Eighth Circuit

17

opinions of *United States v. Holleman*, 743 F.3d 1152 (8th Cir. 2014) and *United States v. Donnelly*, 475 F.3d 946 (8th Cir. 2007) are instructive.[7] In *Donnelly*, the drug dog's in-field performance records showed that drugs were found approximately 54% of the time the dog indicated. *Id.* The court noted that

> [the dog's in-field] record is only one of the factors we consider in the totality of the circumstances calculation. Donnelly does not dispute that Baron received consistent training, that Baron had been examined and considered competent by independent evaluators, that he had been properly certified, that he had been considered reliable by prior courts, and that his accuracy rate exceeded fifty percent.

*Id.* The court reached a similar conclusion in *Holleman*, where the dog had a 57% in-field performance record. *See Holleman*, 743 F.3d at 1157. Here, Zara's in-field performance record of 68% is much higher than the two dogs at issue in *Donnelly* and *Holleman*. And like the dog in *Donnelly*, Zara has previously been found to be reliable. *See United States v. Salgado*, 2013 WL 1348264 at *8-9 (D.S.D. Apr. 1, 2013), *aff'd* 761 F.3d 861 (8th Cir. 2014). Thus, the government's objection is granted to the extent that this court modifies the report and recommendation to include this additional analysis. The magistrate judge's conclusion that Zara was generally reliable, however, is adopted.

### b.     Johnson's objections

Johnson did not object to this portion of the magistrate judge's opinion. Thus, for the reasons stated in section II.B.1.a, the court concludes Zara is generally reliable.

---

[7] Although *Donnelly* was decided prior to *Harris*, the Eighth Circuit's analysis was consistent with *Harris*. For example, the court considered records of the drug dog's in-field and training records to determine if the dog was generally reliable under the totality of the circumstances. *Donnelly*, 475 F.3d at 955.

### 2.    Zara's reliability in this case

The report and recommendation noted that Trooper Biehl and Zara are a team. It recounted that Trooper Biehl and Zara are jointly certified and have been recertified successfully on an annual basis since August 2011. The magistrate judge found that Trooper Biehl's testimony was mostly incredible and concluded that "Zara's indication is the sole fact upon which the probable cause determination rises or falls." Docket 61 at 28. The magistrate judge did not reject Trooper Biehl's testimony outright, however, and credited Trooper Biehl's statement that Zara did, in fact, alert during the stop. *Id.* at 30. The magistrate judge also credited Lieutenant Sheldon's testimony that Zara alerted during the stop. *Id.* (noting that "both troopers who testified said she did 'alert.' "). And the magistrate judge could see from the video that Zara indicated twice by sitting near the rear seams of the trunk. *Id.*

The report and recommendation discussed additional circumstances that bore on the reliability of Zara in this case. For example, the magistrate judge reiterated Trooper Biehl's acknowledgement that his words can "cue" Zara's behavior, but found that Trooper Biehl "did not direct Zara to concentrate unduly on any particular spot on the vehicle." *Id.* The magistrate judge found that Zara's behavior at the time of the search, *i.e.*, that she constantly barked and jumped around the vehicle, was not unusual for a high strung dog like Zara. The magistrate judge also found no evidence that environmental factors such as excessive wind or cold, or the presence of wildlife, affected Zara's abilities during the stop. The magistrate judge concluded that Zara was reliable in this particular case.

### a.    the government's objections

The government agrees with the magistrate judge's conclusion that Zara was reliable in this case. The government objects primarily to the magistrate judge's rejection of Trooper Biehl's credibility.

Before addressing the magistrate judge's credibility finding, the court will address several ancillary objections raised by the government. For example, the government objects to the magistrate judge's finding that Trooper Biehl can "cue" Zara's behavior. But Trooper Biehl acknowledged that his words can cue responses in Zara's behavior. Docket 53 at 29. And Zara can be heard becoming more agitated in the background of the video when Trooper Biehl tells Johnson about Zara's role in a traffic stop. Thus, the objection is overruled.

Relatedly, at the bottom of a paragraph describing how Trooper Biehl and Zara are a team and that Trooper Biehl's words can cue Zara's behavior, the report and recommendation states: "The *Harris* opinion misses this part of the equation too, focusing only on the dog as though it were an infallible Geiger counter, which it certainly is not." Docket 61 at 29. The government objects to this statement and asserts that the standard under *Harris* is whether the dog is reliable under the totality of the circumstances. The report and recommendation, however, properly analyzed the reliability of Zara under *Harris*'s totality of the circumstances framework. Thus, the objection is overruled.

Next, the government objects to an observation made in the report and recommendation that Trooper Biehl cannot determine whether Zara correctly indicated in the field if drugs are not found. Trooper Biehl testified that Zara indicates to the odor of drugs, not to their presence, and that "[t]he odor is still

there that even the human nose can't detect." Docket 53 at 33. In other words, Trooper Biehl cannot always detect for himself that a drug odor is present. And if drugs are not found, Trooper Biehl cannot verify objectively that Zara's indication was accurate. The magistrate judge's finding is a permissible inference from Trooper Biehl's testimony. Thus, the objection is overruled.

Finally, the court addresses the magistrate judge's credibility assessment of Trooper Biehl. A drug dog's handler is often "the only witness who can speak to the subjective interaction during a particular dog alert." *United States v. Howard*, 621 F.3d 433, 449 (6th Cir. 2010). Thus, whether a drug dog's handler is credible is relevant to the issue of whether the dog itself is reliable in a particular case. *See United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010). A party's objection to a magistrate judge's credibility determination receives de novo review. *United States v. Lothridge*, 324 F.3d 599, 601 (8th Cir. 2003); *Taylor v. Farrier*, 910 F.2d 518, 521 (8th Cir. 1990) ("However, once a party makes a proper objection to a magistrate's finding, including a credibility finding, the district court *must* make a de novo determination of that finding") (emphasis in original). The court has reviewed Trooper Biehl's dashboard camera video, Trooper Biehl's narrative report of the incident, the transcripts from the evidentiary hearing, and the audio recordings from those hearings.

The report and recommendation provided several reasons why Trooper Biehl's testimony is not entirely credible. For example, Trooper Biehl's narrative report and testimony stated that he observed the carotid artery in Johnson's neck pounding violently during the stop. Docket 53 at 31. The magistrate judge rejected this observation "as completely incredible," noting that Johnson's neck was

21

wrapped in a thick scarf during the stop and that her neck was not visible. Docket 61 at 21. There was no evidence suggesting that Johnson took her scarf off while she sat in Trooper Biehl's patrol car. And the magistrate judge observed that Johnson's defense counsel raised this issue well in advance of the evidentiary hearing, but the government never asked Trooper Biehl to explain the plausibility of his observation. *Id.* at 21-22.

The government suggests that a small sliver of Johnson's neck is visible in the video and that Trooper Biehl may have been able to observe Johnson's carotid artery pounding through the scarf. The court has reviewed the video and still frame image of Johnson. The court finds that no portion of Johnson's neck is visible. And the court will not assume that Trooper Biehl made an observation that has no support in the record. Thus, the court agrees that Trooper Biehl's purported observation of Johnson's carotid artery is incredible.

The magistrate judge also noted discrepancies between points in Trooper Biehl's memory concerning details during the stop. For example, Trooper Biehl testified that he asked Johnson where she was coming from and that she only mentioned coming from the East Coast. Docket 53 at 14. His report also noted that Johnson referred only to coming from the East Coast and that she refused to be more specific. Exhibit A. A review of the dashboard video demonstrates that Johnson, in fact, told Trooper Biehl that she was coming from "Cape Cod," which is located in Massachusetts. Trooper Biehl also repeated as a question to Johnson whether she was visiting friends in "Cape Cod." Similarly, Trooper Biehl could not remember issuing the "No bite! No bite!" command to Zara. Docket 53 at 34. That command is clear and audibly given in the video.

The magistrate judge also found as unduly critical Trooper Biehl's opinion of Johnson's mode of transportation and her demeanor. As to the fact that Johnson was driving, Trooper Biehl testified that it was a "little strange" because "[y]ou would think that if a close family member had passed away that you would probably want to take the fastest way home." Docket 53 at 14. But Trooper Biehl never asked Johnson why she was driving, and there are a number of benign reasons why someone in her situation would choose to drive. Johnson said she was visiting friends in Massachusetts and that she needed to get to California. She may not have had plans to return to Massachusetts, and it may have made more sense to drive rather than to leave her vehicle across the country only to fly back and make the same trip later. It is also possible that Johnson needed to visit or pick up another relative along the way. The government, nonetheless, cites to evidence disclosed during discovery that suggests Johnson was lying about the timing of her mother's funeral. Probable cause is measured by the totality of the circumstances known to the officer "at the time of the search," not by what facts are uncovered later. *Kennedy*, 427 F.3d at 1140-41. Here, there is no testimony or other evidence in the record that Trooper Biehl knew any of the additional facts offered by the government that were uncovered during discovery. Thus, the court cannot consider this evidence in its analysis.

As to Johnson's demeanor, Trooper Biehl's report noted that Johnson's voice cracked as she spoke to him in the patrol car. The magistrate judge was unable to perceive this incident in the video, and this court cannot either. Trooper Biehl also testified that Johnson gave curt responses to his questions and that she seemed to not want to speak with him. Docket 53 at 13. He recalled that Johnson's hands

23

were shaking when he asked for her license and registration and that she appeared nervous. *Id.* Trooper Biehl also testified that Johnson became "very defensive" when he asked her if Zara would detect the odor of illegal drugs in her car. *Id.* at 15. But a motorist's nervousness or terse answers given during a non-consensual police encounter are, without more, too generic and " 'describe a large category of presumably innocent travelers.' " *United States v. Jones*, 269 F.3d 919, 927-29 (8th Cir. 2001) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980) (observing that a motorist's yawning, voice cracking, hands shaking, and failure to make eye contact with an officer were not indicative of criminal behavior). And the fact that Johnson's demeanor was dour is consistent with her statement that she was returning to California for a funeral. The court concludes that the magistrate judge was correct to discount Trooper Biehl's credibility. Thus, the government's objection is overruled.

### b.      Johnson's objections

As discussed in section II.B.2, *supra*, the magistrate judge found that Trooper Biehl was not entirely credible. But the magistrate judge did credit certain of Trooper Biehl's statements concerning Zara's behavior, including his testimony that Zara alerted during the traffic stop. The magistrate judge likewise credited Lieutenant Sheldon's testimony that Zara alerted. Johnson agrees with the magistrate judge regarding Trooper Biehl's credibility, but objects to the magistrate judge's finding that Zara reliably alerted in this particular case.

Johnson relies on Trooper Biehl's testimony that an alert must precede an indication for the indication to be valid. She likewise relies on Trooper Biehl's testimony that a dog's alert can be subtle and difficult to detect. Johnson argues

further that because Trooper Biehl's credibility has been called into question, so, too, is his observation that Zara gave an alert. She concludes that if Zara did not alert, then Zara's free-standing indication cannot provide probable cause for the search of her vehicle.

The Eighth Circuit in *Holleman* addressed the inverse of Johnson's argument. Here, the video shows that Zara *indicated twice* by sitting near the rear seams of the trunk. In *Holleman*, the drug dog *alerted twice* to the odor of drugs coming from a vehicle. *Holleman*, 743 F.3d at 1156. The dog in *Holleman* did not, however, indicate. *Id.* The defendant argued that because the dog "only 'alerted' to the possible presence of drugs without actually 'indicating' the presence of drugs . . . that a mere 'alert' is insufficient to support probable cause for a search." *Id.*[8] The Eighth Circuit observed that "[s]ome courts have held a trained drug dog's 'alert,' as opposed to the more conclusive 'indication,' is enough to establish probable cause." *Id.* (citations omitted). And the court concluded that it was "not concerned about [the dog's] failure to give a full indication[.]" *Id.* Thus, even accepting Johnson's argument that Zara only gave an indication, the holding in *Holleman* illustrates that Zara's indication can be sufficient to provide probable cause for the search.

Alternatively, the court agrees with the magistrate judge's finding that Zara did, in fact, alert before indicating. The court begins with Lieutenant Sheldon's testimony. Trooper Biehl acknowledged in the abstract that a drug dog's alert "*can be* so subtle that nobody except someone who was physically present and who was

---

[8] The distinction in *Holleman* between an "alert" and an "indication" is the same distinction in this case. *See Holleman*, 743 F.3d at 1156 n.3.

familiar with the dog would be able to note the alert." Docket 53 at 25 (emphasis added). But he did not testify that Zara's alert in this instance was so subtle that only he could detect it on the scene. Rather, Lieutenant Sheldon testified that he was involved in the initial training and certification of Zara. *Id.* at 40, 44 (testifying that he was also a judge for Zara's initial certification). Lieutenant Sheldon was, therefore, familiar with Zara's behavior. He, likewise, watched the video of the traffic stop and "based on [his] experience as a trainer and judge," opined that Zara alerted and indicated. *Id.* at 47. And although Lieutenant Sheldon acknowledged in general terms that he might not see a dog's alert every time, *id.* at 54, Lieutenant Sheldon's testimony that he observed Zara's alert in the video was not challenged. Thus, the court finds that Lieutenant Sheldon's testimony supports that Zara gave a proper alert.

Finally, as noted above, the magistrate judge did not fully discredit Trooper Biehl. The report and recommendation cites Trooper Biehl's testimony that he observed Zara alert. Trooper Biehl also provided testimony concerning his training, his background, Zara's behavior, Zara's training, and other details of the traffic stop that were not called into question. He also testified without qualification that Zara did alert prior to giving an indication. *Id.* at 32. The court finds that Trooper Biehl's testimony, underpinned by Lieutenant Sheldon's testimony, supports that Zara alerted during the traffic stop. Johnson's objection is, therefore, overruled. The court adopts the magistrate judge's conclusion that Zara was reliable in this particular case.

Because Zara was reliable in general and in the present case, her alert and indication gave Trooper Biehl probable cause to search Johnson's vehicle. Thus,

the evidence seized from Johnson's vehicle during that search will not be suppressed.

### CONCLUSION

Trooper Biehl had probable cause to stop Johnson for speeding. His use of Zara during the traffic stop, under the Eighth Circuit's pre-*Rodriguez* caselaw, was a de minimis intrusion on Johnson's liberty. Zara is generally reliable, and she was reliable under the circumstances of this case. Zara's alert and indication to the odor of drugs coming from Johnson's vehicle gave Trooper Biehl probable cause to search the vehicle. Because Trooper Biehl had probable cause to search the vehicle, the evidence seized from Johnson's vehicle will not be suppressed. Accordingly, it is

ORDERED that the report and recommendation (Docket 61) to deny Johnson's motion to suppress evidence is adopted as modified by this opinion.

Dated May 12, 2016.

BY THE COURT:

*/s/Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE